Joseph SCOGGIN, Jr., and Edward
Jefferson, Plaintiffs,

v.

LINCOLN UNIVERSITY and Earl E.
Dawson, President, Defendants.

No. 1259.

United States District Court
W. D. Missouri,
Central Division.

Sept. 19, 1968.

———◆———

Robert B. Curtis, St. Louis, Mo., for plaintiffs.

Norman H. Anderson, Atty. Gen., State of Missouri, Louis C. DeFeo, Jr., Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

### Prefatory Statement

Plaintiffs, two students of Lincoln University, a State supported institution, filed a complaint in which they alleged that defendants, the governing officials of that institution, acting under color of State law, deprived them of rights guaranteed them by the First, Fifth and Fourteenth Amendments to the Constitution of the United States. Jurisdiction was appropriately invoked under Section 1343(3) of Title 28, United States Code and Section 1983 of Title 42, United States Code.

Pursuant to procedures directed and agreed upon at pretrial conference, the parties prepared and filed a full stipulation of facts. At the plenary evidentiary hearing both parties advised that neither wished to adduce any additional evidence.

On May 15, 1968 the judgment attached hereto as Appendix A was entered. The

second paragraph of that judgment stated:

The questions of federal constitutional law presented in this case are likely to be presented in a substantial number of future cases. In accordance with the practice of this Court (see, for example, Taylor v. United States (W.D. Mo., 1963) 224 F.Supp. 82), I have circulated a copy of that memorandum opinion to my colleagues, Chief Judge William H. Becker, and Judges William R. Collinson and Elmo B. Hunter, in order to ascertain whether the legal principles stated can be said to reflect the view of all active judges of this Court.

Another student discipline case was pending before Judge Hunter in Division 4 of this Court (Esteban v. Central Missouri State College, No. 16852-4). A Court en banc order was entered in both cases for briefs and oral argument from the parties and from *amicus curiae*. A copy of that order is attached as Appendix B. The Court en banc received excellent briefs pursuant to that order and heard oral argument on July 31, 1968.

On September 18, 1968, the Court en banc entered a general order stating the judicial standards and substance of procedure that would, in the absence of some exceptional circumstance, be applied to all actions concerning the discipline of students in tax-supported educational institutions of higher education. All the active judges of this Court contributed to and actively participated in the deliberations that resulted in the final order. All unanimously agree with the statement of the applicable standards and principles contained in the general order. We are also agreed that appropriate application of those standards and principles will promote uniformity of decision in this district.

No exceptional circumstances are presented by this case. It is therefore appropriate that the standards and principles stated in the general order be applied to the facts of this case. The general order of the Court en banc of September 18, 1968 is published in 45 F.R. D. 133. Pursuant to Rule 52(a) of the Rules of Civil Procedure, our findings of fact and conclusions of law are stated in this memorandum opinion.

I

*FINDINGS OF FACT*

The parties stipulated and agreed that:

On Wednesday, October 18, 1967, at approximately 5:30 p. m., a disturbance occurred during the supper hour in the cafeteria of the Lincoln University Student Union Building while a large number of students were gathered either eating or waiting to be served. The disturbance included the dropping of trays and food, the upturning of tables and chairs and the throwing of dishes and glassware. Approximately $1,500 damage was done to property of the University.

On October 19, 1967, the Committee on Student Personnel Services * * convened for the purpose of investigating the occurrence and recommending disciplinary action where appropriate. Dr. J. Erroll Miller served as acting chairman. The Committee held nine sessions between October 19 and October 27, 1967.

On October 20, 1967, the Committee placed formal charges against the plaintiffs and other students for

"planning and/or participating in a demonstration which led to destruction of University property on Wednesday, October 18, 1967, at the Student Union Building."

Notice of the charge was made by telegram stating the charge and informing the student of his right to be heard and to bring witnesses in his behalf. A telegram dated October 20, 1967, 6:45 p. m. [was sent] plaintiff, Scoggin, directing [him] to appear before the Committee at 10:00 a. m., October 21, 1967 to answer the charge. A telegram of the same date and content [was sent] plaintiff, Edward Jefferson.

Plaintiff Jefferson [received his telegram] between 9:00 and 10:00 p. m., Friday, October 20, 1967. Plaintiff

Scoggin [received his] either Friday night or on the following Saturday morning. Plaintiffs Jefferson and Scoggin appeared before the Committee the afternoon of Saturday, October 21, 1967.

When plaintiffs appeared before the Committee the afternoon of October 21, 1967, neither had an attorney personally present. Plaintiff Scoggin was in communication with his attorney prior to answering the charge before the Committee.

On October 24, 1967, the Committee voted to recommend suspension of the plaintiffs for the remainder of the school year ending May 31, 1968.

On October 26, 1967 President Dawson by letter informed the plaintiffs of their suspension from the University.

By letter dated October 29, 1967, Robert B. Curtis, attorney for plaintiffs, requested reconsideration of the findings and recommendations of the Committee and enumerated alleged errors in the proceedings.

On November 9, 1967, the Executive Committee of the Board of Curators heard plaintiffs' request for reconsideration. Plaintiffs were represented by counsel at this hearing. The Executive Committee denied plaintiffs' request for reconsideration, approved the findings of the Committee on Student Personnel Services and affirmed the action of the President.

Plaintiffs did not receive a copy of the report of the Committee until after the commencement of this suit.

The problem of the cost and quality of the food served in the cafeteria at Lincoln University was not of recent origin. Demonstrations concerning that situation occurred at least as early as the year preceding the current incident. Exhibit J was a copy of a memorandum dated October 14, 1967 from Dean of Students Pugh to all Lincoln University students on the subject of an increase in board cost that went into effect for the Fall semester in 1967. That notice, posted the Saturday before the disturbance occurred the following Wednesday, stated:

It has come to the attention of the Dean of Students that there is considerable concern, among a good number of our students, about the recent increase in the cost of a university room and board contract.

This note is written with the hope that (1) some of your questions will be answered, and (2) that some light might be shed on a few areas of misunderstanding.

The Dean then set forth three reasons for the increase and concluded as follows:

There has been some talk of organized demonstrations to protest Cafeteria conditions; and it is understood that the movement toward such displays of dissatisfaction is already afoot.

It is hoped we can resolve said situation without a demonstration, through the efforts of our S.G.A. (Student Council), Catering Management representatives, and our "Cafeteria Board."

But if it becomes apparent that we "must" demonstrate, it is hoped we (1) respect the rights of those who may not share in our decided methods, (2) be orderly and peaceful, and (3) respect and care for university property.

Exhibit B attached to the stipulation of the parties is a copy of the reported proceedings of the Committee. That exhibit shows that the committee was initially convened on Wednesday, October 18, 1967, the day following the disturbance, and commenced what it called the "investigation phase of its work." It listened first to reports from Dean Pugh, Dean Chapman, Dean Adams, and Student President Brown. Mr. Marshall thereafter moved that "all persons whose names have been advanced here before the Committee [by the reports it had just heard] be instructed to appear before the Committee, first for questioning, as a part of the committee's investigation of the situation, and later, if necessary, for a hearing of any charges that might be

placed before them, if the investigation warranted such action."

When plaintiff Scoggin was first called before the committee he was advised that "no charges had been placed against any one at this point, since the Committee was still in the investigation phase of its work." After listening to three days of "investigation" testimony "the Committee reviewed all the testimony which had been heard to this point, and determined that sufficient cause existed to place formal charges against the following persons: [naming seven students including both plaintiffs]."

The single charge formulated against all seven students was that each was allegedly guilty of:

Planning and/or participating in a demonstration which led to the destruction of University property on Wednesday, October 18, 1967, at the Student Union Building.

Consideration of student activity and of the later proceedings before the discipline committee must be viewed in light of the notice given all students on October 14, 1967, which stated that "if it becomes apparent that we 'must' demonstrate [to protest Cafeteria conditions] it is hoped we (1) respect the rights of those who do not share in our decided methods, (2) be orderly and peaceful, and (3) respect and care for university property."

Study of the committee's proceedings makes it apparent that it was difficult at best for the committee to have avoided commingling testimony it heard during the investigation phase of its work with that which it later heard during the phase in which it processed the charges it brought first against seven, and still later, against three more students. More important, and totally apart from the problem of commingling, it is impossible to tell from the committee proceedings whether it considered testimony that a particular student wanted a "demonstration" in accordance with that contemplated in Dean Pugh's notice as evidence supporting its charge that such student was guilty of "planning * * * a demonstration which led to the destruction of property."

In some instances, as illustrated by its questioning of student Michael Hughes (a student against whom no charge was brought), the committee clearly distinguished between what it sometimes called "the demonstration" and what it at other times referred to as "the subsequent upheaval in the cafeteria." In most instances, however, the factual distinction between the sort of "demonstration" contemplated by the October 14, 1967 notice and the sort of "demonstration" that occurred on October 18, 1967, was not recognized by the committee. Viewed as a whole, it is apparent that the committee proceeded on the unarticulated assumption that if the evidence established that a particular student, including both plaintiffs, had helped plan *any sort* of a demonstration they should be disciplined.

A large part of the difficulty concerning this case arose from indiscriminate use of the word "demonstration." We do not indulge in legal niceties when we factually recognize that the word "demonstration" means different things to different people on the campus today. Dean Pugh's public announcement of October 14, 1967 used that word in the sense that clearly contemplated that the anticipated student "demonstration" would be peaceful in nature and that appropriate respect would be accorded the rights and property of others. (The Dean obviously was familiar with the principles stated in such leading cases as Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628.)

Evidence that related to students other than the plaintiffs, however, established that a few particular students at Lincoln University viewed a student "demonstration" as an occasion for violent confrontation with what they would label part of the Establishment. That essentially nihilistic notion rejects the fundamental idea of our democracy that the exercise of rights guaranteed by the Bill of Rights

of the Constitution of the United States is an effective instrument for change. Indeed, that view accepts the related anarchical notion that a modern day student "demonstration" must, in order to be effective, include destruction, violence, and sometimes obscenity so that attention is focused on the asserted decadence and obsolescence of the institution under attack.

The committee's charge that plaintiffs planned and participated in a "demonstration which led to the destruction of University property" must be read in light of the meaning given the word "demonstration" by the committee and must be considered as a charge that plaintiffs in fact planned a "demonstration" different in kind from that authorized and contemplated in Dean Pugh's October 14, 1967 notice or that plaintiffs had in fact personally participated in the destruction of University property.

Our review of the committee's proceedings leaves us with a firm conviction that the Committee's consideration of the data before it rested on the premise that it was not necessary to establish that plaintiffs had either (a) planned a demonstration different from that contemplated by Dean Pugh's October 14, 1967 notice or (b) that they had personally destroyed University property.

■ So far as the two plaintiffs involved in this case are concerned, the proceedings of the committee demonstrate that there was no substantial evidence to support a finding that those two students had in fact planned a demonstration different from that authorized on October 14, 1967 or that either had in fact personally destroyed University property.

Although counsel argue to the contrary, it is perfectly clear that the committee was convinced that neither plaintiff actually destroyed any University property. Plaintiffs' names were omitted from the list of students finally named as "persons known to the Committee as involved actively * * * in destroying state or university property." Plaintiffs' names were in fact included on a separate list of persons whom the committee believed had only "supported or helped plan or project the demonstration *which led to* the destruction of state or university property."

Defendants concede that "there is nothing in the record of the committee to show that either plaintiffs directly turned over tables, dropped trays, threw glasses, spilled food, etc." But defendants argue that the committee was entitled to accept, and that this Court should predicate a finding of fact upon certain statements made by the Deans in their initial reports to the committee. Defendants suggest that this "information before the committee" affords a factual base for factual findings that (a) both plaintiffs had vigorously urged that "a demonstration" be held; that (b) plaintiff Scoggin "was the principal one urging the holding of a demonstration;" (c) that plaintiffs had urged other students both "to participate in the demonstration" and (d) to "drop trays and food and otherwise disrupt the cafeteria;" and that (e) although neither plaintiff "directly destroyed property, they were present during the disturbance and moved about the room urging others to act."

Only suggested findings (d) and (e) are relevant because, as stated in the October 14, 1967 notice, the University recognized and anticipated that a student "demonstration" would likely follow in the wake of the increase in food cost. It is obvious that no student could properly be disciplined for planning, participating, or urging others to participate in the sort of "demonstration" contemplated by the October 14, 1967 notice. To support their suggested findings that plaintiffs urged others to drop trays and food and otherwise disrupt the cafeteria and that they had in fact moved around the room urging others to act (facts which would have, if supported by substantial evidence, warranted the imposition of discipline), defendants direct our attention to only nine separate pages of the committee's proceedings. Those pages show that plaintiff Scoggin's reported threat that he wanted "to hit and strangle the economy" and a report that he had said that

the "whole school could be destroyed" were contained only in the Deans' initial reports to the committee. Dean Pugh advised the committee that "his interviews with several students revealed that freshman participators apparently had been used as 'tools' by [a] small group [of students which reportedly included plaintiff Scoggin]." Dean Pugh also reported that particular "students had given [him] statements that they were willing to testify that Scoggin had encouraged them to revolt and to damage the cafeteria and/or property in the Union building by pushing over trays; and that Scoggin's main interest appeared to many students to have been mainly that of creating unrest." Neither the names of the students interviewed nor the statements of the students to which Dean Pugh made reference in his report were ever presented to the committee or otherwise introduced in evidence in this case.

We do not, of course, imply that Dean Pugh did not accurately report what his preliminary survey had indicated would be available evidence. The record reflects circumstances that could well be considered as a reasonable explanation of why the particular students to whom Dean Pugh referred were not called as witnesses.

The general turmoil that commenced in the cafeteria on Wednesday, October 18, 1967, did not stop as quickly as it began. The course of the disturbance at Lincoln University followed the general pattern of disturbances that have occurred elsewhere. The committee proceedings, show, for example, that on Friday, noon, October 20, 1967, "a large group of students had been seen congregating in front of Page library" and that "a 'call' mass meeting [had been] conducted at Perry Hall during the noon hour." The Highway Patrol, which was still on campus, reported to the committee that its "hearings might be disrupted because of a rumor that Mr. Raymond Parks had been suspended." (The committee at no time voted to suspend Mr. Parks. It initially found him to be "not guilty" and later decided to place him on "strict social pro-

bation for the remainder of his undergraduate career at Lincoln University".)

On Monday, October 23, 1967, after the committee had finished its sixth session, it adjourned until 9:00 a. m. on Thursday, October 27, 1967. The proceedings show, however, that the committee was called back in "extraordinary session on Tuesday, October 24, 1967, at 9:30 a. m. [for the stated reason] that the tensions and pressures on the campus were mounting to such an extent that [the Chairman] deemed it propitious for the welfare of the students, staff and the community for us to proceed without delay." That extraordinary session was "called to complete the hearings already begun and to conclude what, if any, recommendations this committee desired to submit to the President of the University."

Another circumstance that might have played its part is reflected by the notation in the committee's proceedings held Saturday, October 21, 1967, which shows that after the witnesses had been excused "there was some comment on the fact that the Housemother in Anthony Hall, Mrs. Seibert, and several other students had expressed fear and hesitancy about giving testimony for fear of reprisal on the part of students." There is no suggestion in the committee's proceedings or otherwise that either plaintiff or anyone else in fact attempted to intimidate any witness that the committee wanted to hear. Such evidence would have, of course, warranted appropriate disciplinary action. It is not at all unlikely, however, that the students to whom the Dean referred were not called because the general tenseness of the atmosphere that prevailed on the campus dictated that the committee wind up its proceedings as expeditiously as possible. However understandable the reason, the fact remains that the committee neither heard the testimony of the students with whom the Dean had talked nor did it consider their written statements.

In light of the serious nature of the charges under consideration and their consequences, the data to which counsel directs our attention cannot be considered

as sufficient substantial evidence upon which severe disciplinary sanctions may properly be imposed.

Data that plaintiff Scoggin was in favor of a "demonstration" cannot, as counsel for defendants suggest, be considered as substantial evidence that he planned a demonstration different in kind from that authorized by the October 14, 1967 notice. Statements, for example, in the committee's proceedings to the effect that "Mr. Scoggin was in student meetings openly advocating quick and definite action of the students in the matter of a demonstration on the campus, and refusing to accept any other solution to the alleged problems," without more, does not constitute substantial evidence that plaintiff Scoggin had in mind any different kind of demonstration than that anticipated by the October 14, 1967 notice. Such isolated statements in the committee's proceedings must be read in context. The example just given was followed by the statement that "Mr. Scoggin had openly urged the students *not* to accept the action of the SGA, the Cafeteria Board reports, nor the Dean's information as gleaned from the Catering Management Personnel, the President of the University, the Business Manager, and the Maintenance Staff, all of whom the Dean had contacted, in an effort to eliminate the problems of which the students complained."

It is ironic that the committee came to exactly the same conclusion in regard to the food situation in the cafeteria at the end of all their hearings. On October 25, 1967 it formally recommended that the President of Lincoln University give serious consideration to the following:

> Since sufficient evidence has been presented to the Committee to strongly suggest that the food in the cafeteria is of less than satisfactory quality preparation, and quantity, it is recommended that this matter be investigated immediately, by an impartial dietician, and if these charges prove correct, that necessary action be taken to correct the situation.

The other pages of the committee proceedings to which the defendants direct our attention do not support their suggested findings. On page 9, James Carter, a Foster Hall student, testified only that plaintiff Scoggin opposed any deferment of the "planned demonstration." He did state that plaintiff Scoggin was "doing most of the talking" at the meeting. It should perhaps be added parenthetically that the only student to describe plaintiff Scoggin's effectiveness as a student leader testified: "Joseph Scoggin was very vocal. * * * but 'everyone knew he was a fool' " and "wouldn't follow him anywhere or take his advice." It is not necessary to resolve the obvious conflict of opinion concerning plaintiff Scoggin's ability to influence his fellow students.

Page 10 of the committee proceedings to which our attention is directed shows that plaintiff Jefferson admitted that he sent, but did not write, the telegram to Catering Management in Columbia. That telegram stated that the Boarding Students at Lincoln University wanted that company to send a representative to Perry Hall on October 16, 1967. A representative of that company did come from Columbia to Jefferson City on that day to confer about the food it was serving the students. Apart from the fact that it is indeed difficult to see how the mission of the University is sufficiently broad to authorize the regulation of what telegrams its students send, it is quite apparent that any cause or necessity for "direct action" by the students so far as any alleged refusal on the part of Catering Management Company to discuss the food situation was removed at least two days before the demonstration took place. We believe that the author of the telegram put that isolated telegram incident in proper perspective. Student Harry Walker testified that he had been asked by students other than plaintiffs "to help with the telegram because I was a Journalism student." He did not connect either plaintiff in any way with the writing of the telegram. Mr. Walker

testified that "the telegram had nothing to do with the riot." We agree.

Pages 12 and 13 of the committee's proceedings do not support defendants' suggested findings. Page 12 reflects the testimony of James Elton Oubre. The only mention of either plaintiff by Mr. Oubre was that he knew that plaintiff Scoggin had attended a meeting at Perry Hall. Mr. Oubre made clear to the committee that he had not been "incited to riot" by anyone and that he was "responsible for himself, not his peers."

The testimony of Mr. Quincy Hobbs, the Counselor of Foster Hall, appears on page 13. That witness testified that he had called one of the Foster Hall meetings at which some unidentified person spoke "in a manner that was not in the best interest of the school." He told the committee how "several fellows felt about Damon Walker being one of the main persons to incite the demonstration." He purported to "quote a number of freshmen" as saying that they had been urged to "drop trays in the cafeteria." Mr. Hobbs told the committee that he had talked to freshmen who "could identify those persons by sight." The committee, however, neither asked Mr. Hobbs for the names of those potential witnesses nor did it ever call the unnamed freshmen as witnesses. Such testimony cannot be considered as substantial evidence to support defendants' requested findings.

Nor was there any testimony or other substantial evidence that can be said to support that portion of defendants' suggested finding that the two plaintiffs "moved about urging others to act." Dean of Women Adams was the only person to even report that a "small band of students moved about from one group of students to another group." Dean Adams stated that the "second violent eruption [occurred] at the rear of the cafeteria [where] the Troopers were." She added that she, "Mr. Scoggin, Dean Pugh, and [student] Hughes *moved toward* the disturbance." Dean Adams did not state where the first eruption occurred. Plaintiff Scoggin obviously could not have caused the second eruption because he was not there.

There is some real doubt that plaintiff Jefferson was even in the cafeteria at the time of the disturbance. The evidence on that score was conflicting. The most, however, that anyone said in regard to plaintiff Jefferson being in the cafeteria was that "he was standing in line [with those waiting to be served] when the demonstration began." Certainly no one said he moved from group to group urging others to act.

Plaintiffs were not charged with having incited other students to destroy property. There is no substantial evidence to support such a charge had it been made. Plaintiffs' suspension can not be justified on the basis suggested by defendants.

We find and determine that the committee's charge against plaintiffs did not appropriately distinguish between action that the plaintiffs could legally take and action for which the committee could lawfully impose disciplinary sanctions. In hearing and considering the testimony of the witnesses and in making its recommendation of suspension we find that the committee could not and did not properly differentiate between plaintiffs' right to plan and to participate in the sort of demonstration authorized by the October 14, 1967 notice and the committee's unquestioned right to discipline students for unlawful conduct, including, but not in any way limited to, the planning and knowing participation in the sort of violent and destructive "demonstration" that occurred on October 18, 1967.

We further find that the committee apparently determined that proof that the October 18, 1967 "demonstration" did in fact lead to the destruction of University property was sufficient substantial evidence that all persons, including plaintiffs, who played an active part in the planning of, or who participated in that "demonstration" must have known and intended that it would be a violent one, inconsistent with the sort of dem-

onstration authorized by the October 14, 1967 notice.

On the basis of all the facts and circumstances we must and do find that the disciplinary action taken against plaintiffs was not based upon adequate substantial evidence to support its imposition. The defendants' suggested findings of fact are refused for the reasons stated.

## II

On May 24, 1968 defendants filed a timely motion in accordance with the suggestion made in the judgment filed May 15, 1968 to avoid possible complications concerning the timeliness of any possible appeal. In light of the fact that our findings of fact and conclusions of law are included in this memorandum opinion pursuant to Rule 52(a) of the Rules of Civil Procedure, defendants' motion will be denied.

■ On July 15, 1968 defendants filed a motion to dismiss this action for mootness. In support of that motion defendants allege that both plaintiffs have been reinstated as students in good standing at Lincoln University. Defendants also disclaim in that motion any intent to institute any new disciplinary proceedings against the plaintiffs. Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620 (1923), and Missouri Public Service Company v. City of Trenton (8th Cir. 1935) 80 F.2d 520, both of which involve questions of mootness on appeal, are relied on by defendants in their suggestions in support of their motion.

The exhibits attached to the affidavit filed in support of defendants' motion establishes that plaintiffs were not reinstated as students in good standing until after this Court rendered judgment on May 15, 1968. Data attached to plaintiffs' suggestions in opposition show that before this Court's judgment of May 15, 1968 the Department of the Army contemplated convening a board of officers to determine plaintiff Scoggin's suitability for retention in the United States Army Reserve. The Army identified plaintiff Scoggin's "activities in the protest marches and demonstrations against the Lincoln University which resulted in his punitive suspension from the University" as an involvement of a discreditable nature that prompted the Army's then contemplated action.

City of Miami v. McCrory Stores Corporation (5th Cir. 1950), 181 F.2d 368, illustrates that the cases upon which defendants rely only represent specific applications of general principles relating to when a case is to be considered moot in an appellate court as controlled by the facts of a particular case. Rules applicable to appellate mootness do not necessarily apply to questions of mootness in a trial court.

This Court dealt with the question of mootness in our General Order set forth in Part I of this memorandum opinion. It was there stated that:

> In an action at law or equity under Section 1983, Title 42, U.S.C., to review severe student disciplinary action the doctrine of mootness is not applicable when the action is timely filed. Cf. Carafas v. La Valle, [LaVallee] 391 U.S. 234 [88 S.Ct. 1556, 20 L.Ed.2d 554] (1968), overruling Parker v. Ellis, 362 U.S. 574 [80 S.Ct. 909, 4 L.Ed.2d 963] (1960); and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), qualifying St. Pierre v. United States, 319 U.S. 41 [63 S.Ct. 910, 87 L.Ed. 1199] (1943).

This action was timely filed. The principle stated in the General Order is applicable. The fact that defendants have complied with the Court's judgment of May 15, 1968 and may have thereby mooted their right of appellate review does not mean that some occasion for future order to enforce the judgment in this case may not arise.

The sort of collateral consequence of the disciplinary action taken by the defendants is illustrated by the interest the Army showed in that matter until the defendants' actions were set aside. Similar problems might arise in con-

nection with plaintiffs' possible application for admission in a graduate school or a profession. Power to appropriately modify and enforce our decree would be lost if defendants' motion is granted. Defendants' motion to dismiss for mootness should and will therefore be denied.

■ Application of the principles and standards stated in the General Order of this Court en banc requires that the plaintiffs be granted the relief stated in the Judgment entered May 15, 1968. Paragraph 11 of the procedural and jurisdictional standards state that in severe cases of student discipline, such as a long-term suspension for alleged misconduct, the institution is obliged to give the student minimal procedural requirements of due process of law. Dixon v. Alabama State Board of Education (5th Cir. 1961) 294 F.2d 150, cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed. 2d 193; Esteban v. Central Missouri State College (W.D.Mo.1967) 277 F.Supp. 649.

■ The General Order recognized that the requirements of due process do not demand an inflexible procedure for all student discipline cases. It stated, however, that:

Three minimal requirements apply in cases of severe discipline, growing out of fundamental conceptions of fairness implicit in procedural due process. First, the student should be given adequate notice in writing of the specific ground or grounds and the nature of the evidence on which the disciplinary proceedings are based. Second, the student should be given an opportunity for a hearing in which the disciplinary authority provides a fair opportunity for hearing of the student's position, explanations and evidence. The third requirement is that no disciplinary action be taken on grounds which are not supported by any substantial evidence.

■ It is apparent from our findings of fact that the notice given in this case did not appropriately advise the plaintiffs of the specific ground or grounds on which the disciplinary proceedings were based. The nature of the evidence upon which the charges were based did not make those specific grounds apparent to plaintiffs when they were before the committee because the committee itself did not appropriately recognize the distinction between planning and participating in the sort of "demonstration" authorized and contemplated by the October 14, 1967 notice and the sort of "demonstration" which actually occurred on October 18, 1967.

The October 14, 1967 notice to all students properly recognized the appropriate function of free speech under our system of government. That function was stated in Edwards v. South Carolina, 372 U.S. 229 at 237, 83 S.Ct. 680, at 684, 9 L.Ed.2d 697 (1963), in which it was held that:

[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.

With equal propriety, the October 14, 1967 notice called upon all students who might demonstrate to "(1) respect the rights of those who may not share in our decided methods, (2) be orderly and peaceful, and (3) respect and care for University property."

■ The October 14, 1967 notice appropriately recognized that the First Amendment protects freedom of speech, the right peaceably to assemble, and the right to petition for a redress of grievances but that it does not license conduct which violates a valid rule or regulation of an educational institution even though such conduct may be accompanied and associated with speach, assemblies, and petitions for redress of grievances. The First Amendment does not prohibit an

educational institution from protecting itself against conduct that would destroy it.

Buttny v. Smiley, D.Colo.1968, 281 F.Supp. 280, involved students who participated in a "demonstration" at the University of Colorado which included physically blocking and prohibiting entrance to university buildings. The students and others involved contended that such conduct was protected by the First Amendment. In response to that argument the court stated:

> Plaintiffs contended that the action of the University officials had a "chilling" effect on the First Amendment right of freedom of speech. What they said on the occasion in question is not the basis for the disciplinary proceedings; it is what they did. We hold that the First Amendment guarantee of freedom of speech, as it is related to plaintiffs' activities here, does not give them the right to prevent lawful access to campus facilities. We have been unable to find any case that holds that active, aggressive physical action may properly be characterized by the courts as free speech.

■ Recognition in the notice of October 14, 1967 that "there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place," Cox v. State of Louisiana, 379 U.S. 559 at 574, 85 S.Ct. 476, at 486, 13 L.Ed.2d 487 (1965), was not in any way inconsistent with the protections of the First Amendment.

■ All persons, including students, must recognize that a course of conduct violative of a valid rule or regulation of an educational institution does not gain the protection of the First Amendment merely because such conduct is in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.

The most familiar and classic illustration of the principle that certain forms of conduct mixed with speech may be appropriately regulated and even prohibited was that made by Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47 at 52, 39 S.Ct. 247 at 249, 63 L.Ed. 470 (1919), when he said that "the most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."

But to say that the October 14, 1967 notice gave appropriate recognition to the First Amendment considerations involved, is not to say that the committee's charge, the manner in which it received and considered the testimony, and its conduct of its proceedings under the circumstances, reflected the same recognition explicitly stated in the notice.

Our findings of fact make clear the indefinite manner in which the word "demonstration" was used in the charge and referred to in the testimony. Those findings also make clear that there was not sufficient substantial evidence presented upon which to base a valid finding that the two students here involved had done anything that violated the notice of October 14, 1967. Under the facts as we have found them, application of the standards stated in the General Order requires that we find and determine that plaintiffs were not accorded the procedural due process to which they were entitled.

■ Our findings of fact could not fail to note that the conditions under which the committee elected to proceed were far from ideal. No principle of law requires an educational institution to commence disciplinary proceedings at a time when the campus is in an uproar. Appropriate action can be taken consistent with the circumstances to insure the temporary removal of students and others who persist in efforts to reduce the academic community to a state of permanent chaos. The hearing of disciplinary cases produced by violent student conduct may, and probably should, be continued for a reasonable time consistent with conditions on the campus.

If a particular educational institution has promulgated an appropriate disciplinary code, and is engaged in the process of following such code, it need not fear that one of its students will be able to maintain some sort of federal court action before the institution has had a reasonable period of time under the circumstances within which to conduct a proper disciplinary proceeding in accordance with its established code. Our General Order makes clear in paragraph 3 of its standards that "ordinarily until the currently available adequate and effective institutional processes have been exhausted, the disciplinary action is not final and the controversy is not ripe for determination."

Our determination of this case, involving only two Lincoln University students, is not to be improperly construed as any reflection on the integrity or sincerity of the administration, faculty or student members of the disciplinary committee or of those who approved its recommendations. The entire record reflects that all members of the committee served with dedication under extremely trying circumstances. It is unfortunate that the committee did not have assistance of legal counsel to guide it in regard to the not uncomplicated problems which arise in cases where speech is mixed with conduct because the record demonstrates beyond question that the deficiencies that require the disciplinary action to be set aside did not result from any intention on the part of any member of the committee or the part of anyone else not to deal fairly with the students at Lincoln University.

We who live today tend to view the current scene of student unrest and violence as a totally new historical phenomenon. Professor Lewis B. Mayhew of Stanford University recently suggested that there may be "good reason to believe that the present wave of student unrest may be qualitatively different from those [of] earlier times," Saturday Review, August 17, 1968, p. 57. But he also made clear that the problem of restless students was indeed an old one. In order "to put the problem in some kind of historical perspective" he stated that:

Students have always been difficult to live with and have frequently assumed postures which bothered adults and disturbed institutions. Medieval students rioted, dumped garbage on passersby, wrote erotic or ribald poems and read them on church steps and in other sanctuaries of the Establishment, coerced their professors and occasionally killed one. Colonial college students rioted about food, stole, took pot shots at university presidents, protested infringement of their private lives, and gradually forced colleges to modify stringent rules regarding personal conduct. Nineteenth-century college students took sides over the Civil War and demanded a voice in academic governance. Twentieth-century signed the Oxford Peace Pledge, joined in the Spanish Civil War, rioted over food, violated the Eighteenth Amendment, and experimented with sex. * * *. [A]t least an important portion of student protest replicates those of the past simply because the process of growing up is, after all, a human process that has not changed much in quite a few years.

Full credit may be given for the teaching of history that student protests have, on not infrequent occasions, been, to again borrow Professor Mayhew's words, in "real responses to bad conditions." He stated, for example, that:

A confrontation between Princeton students of different persuasions, a hundred years ago, dramatized the serious moral questions as to whether justice lay with the North or the South. Student agitation over strict rules of conduct was sparked by an overzealous desire on the part of faculty to impose a Puritan ideal of conduct which was inappropriate in a changing society. Perhaps historical reflection might suggest that old standards can be changed and the world still turn.

██ But students from medieval times to the present have been required to learn that a riot is no less a riot simply because those who constitute the mob happen to be students. Acceptance of the time-tested techniques of demagogy and glorification of the violence of the mob by a student to support what he may believe to be an ideal does not alter the nature of his conduct nor does his youth give him immunity from disciplinary action based on conduct that may violate a valid rule of a particular educational institution, to say nothing of violations of the civil and criminal laws that govern the society of which, whether he likes it or not, he is a part.

The necessity that we learn from the past is not confined to the students. Professor Mayhew stated that:

In virtually every major campus upset since 1964, there was a lack of procedures and procedural rights which could have kept grievances within legitimate bounds. The technique of direct administrative handling of disciplinary matters has lost its legitimacy in the eyes of students and many faculty, and this fact should be recognized. The nature of needed changes seems reasonably clear.

The glory of education in a democratic society is that all who must learn can and do learn so that appropriate changes are made in a peaceful manner. It is by this process, which sometimes operates more slowly than many desire, that the occasion for violence and its lure to the immature is removed.

We noted in our General Order that many of the recommendations concerning disciplinary procedures made by members of the academic community represented wise determinations of policy and procedure far above the minimum requirements of federal law stated in that order. Adoption and compliance with the standards recommended to educational institutions by qualified persons from within their own ranks, undoubtedly would tend to keep the problems of student discipline on the campus and out of the courts. Proper administration of fair disciplinary procedures would also serve the educational mission of the institution and its students.

Institutions that have adopted and followed disciplinary procedures comparable to those recommended in the Joint Statement consistently have had their impositions of discipline sustained by the courts. See, for example, Goldberg v. Regents of University of California, 1967, 248 Cal.App.2d 867, 57 Cal. Rptr. 463, and Buttny v. Smiley, D. Colo.1968, 281 F.Supp. 280. Compare Zanders v. Louisiana State Board of Education, W.D.La.1968, 281 F.Supp. 747.

For the reasons stated, it is

Ordered that defendants' motion to amend judgment and findings or for new trial filed May 24, 1968 should be and is hereby denied. It is further

Ordered that pursuant to Rule 52(a) of the Rules of Civil Procedure the findings of facts and conclusions of law included in our memorandum opinion are now filed in support of the judgment entered May 15, 1968. It is further

Ordered that defendants' motion to dismiss for mootness should be and is hereby denied. It is further

Ordered that the judgment of May 18, 1968 should be and is hereby reaffirmed and the same shall be considered as having been reentered this date.

### APPENDIX A

### JUDGMENT

After plenary evidentiary hearing held March 8, 1968, and after careful consideration of the suggested findings of fact, the suggested conclusions of law, and the supporting briefs subsequently submitted by the parties, it has been determined that plaintiffs are entitled to appropriate relief in accordance with plaintiffs' prayer. Appropriate findings of fact and our conclusions of law have been found and stated in a memorandum opinion pursuant to Rule 52(a). That

memorandum opinion is not today filed of record for the reasons we now state.

The questions of federal constitutional law presented in this case are likely to be presented in a substantial number of future cases. In accordance with the practice of this Court (see, for example, Taylor v. United States (W.D.Mo., 1963) 224 F.Supp. 82), I have circulated a copy of that memorandum opinion to my colleagues, Chief Judge William H. Becker, and Judges William R. Collinson and Elmo B. Hunter, in order to ascertain whether the legal principles stated can be said to reflect the view of all active judges of this Court.

Limitations of time and prior commitments of my brother judges have made it impossible for them to give the legal conclusions stated in my memorandum opinion the necessary study required for an expression of their respective views. Pressures of time in regard to the appropriate relief to be granted and possible future proceedings in this case, however, require that we issue our order at the present time and that we file our memorandum opinion after my brother judges are in a position to indicate their considered views of the applicable principles of law. Fairness to all parties requires that they presently be advised of our determination of the merits in this case during the current semester at Lincoln University.

Our memorandum opinion, in which are included our findings of fact and conclusions of law, will be filed as promptly as possible. In order that defendants may avoid any possible complications concerning the timeliness of filing any possible appeal, we suggest that defendants consider filing a timely motion for additional findings, pursuant to Rule 52(b), Federal Rules of Civil Procedure, in order to terminate the running of the time for appeal as expressly provided in Rule 73(a). Should defendants decide to do so, their time for appeal would commence to run with our anticipated order denying such Rule 52(b) motion which

we would enter at the same time we file our memorandum opinion.

For the reasons stated, it is hereby

Ordered that defendants' action suspending both plaintiffs from Lincoln University should be and is hereby held to be void. It is further

Ordered that defendants immediately reinstate both plaintiffs as students in good standing in Lincoln University. It is further

Ordered, consistent with the rationale of Esteban v. Central Missouri State College (W.D.Mo.1967) 277 F.Supp. 649, and Hammond v. South Carolina State College (D.S.C.1967) 272 F.Supp. 947, plaintiffs' reinstatement as students in good standing is subject to defendants' right to institute a new and proper disciplinary proceeding against the plaintiffs for the alleged violation of any existent regulation of Lincoln University. This, of course, does not mean that defendants are required to bring any new disciplinary charges against plaintiffs; we merely make clear that defendants may do so if, in the exercise of their discretion and best judgment, they determine that, under all the circumstances, some new disciplinary proceeding should be brought against plaintiffs.

APPENDIX B

ORDER FOR BRIEFS AND ORAL ARGUMENT ON STANDARDS FOR FEDERAL REVIEW OF DISCIPLINE OF STUDENTS IN PUBLIC SCHOOLS, COLLEGES AND UNIVERSITIES

In these civil actions the plaintiffs are seeking federal review of the actions of the defendant publicly supported educational institutions' disciplining the plaintiffs for alleged misconduct. In each of these cases plaintiffs claim violation of rights protected by the Constitution and statutes of the United States. The *Esteban* case is before the Court for the second time on a complaint seeking review of disciplinary action arising from the same incident involved in the first *Esteban* case. See (W.D.Mo., 1967) 277

F.Supp. 649. The instances of resort to the federal courts for review of cases of student discipline are increasing in this and other federal districts. In view of current student unrest the problems of the educational institutions, of the students, and of the courts appear likely to increase in the absence of reliable and explicit federal standards of student conduct and of lawful disciplinary procedures. The absence of such standards leads to controversies between individual students and groups of students on the one hand and the educational institutions on the other hand.

In the areas of state and federal law applicable to discipline of students there is accelerated movement and rapid development since the decision in Dixon v. Alabama State Board of Education (C.A. 5, 1961) 294 F.2d 150, cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. See III The College Counsel No. 1, pages 1 to 54 (1968); Developments In The Law—Academic Freedom, 81 Harvard Law Review 1045, l.c. 1128–1159. In these two cases this Court has concluded that it is necessary and desirable that reliable and explicit minimal federal standards of substantive and procedural law be enunciated for final disposition of these two cases and as guidelines in the future for all concerned in discipline of students in publicly supported educational institutions in this district. (In the *Scoggin* case the filing of a memorandum opinion containing such standards has been deferred pending the hearing scheduled in this order, but a decision on the merits has been rendered because of time considerations.)

For the reasons stated herein, it is hereby

Ordered that on Wednesday, July 31, 1968 at 10:00 a. m., a hearing be held in the above-entitled cases at the United States Courthouse, Kansas City, Missouri, before the United States District Court *en banc* on the questions of federal standards of substance and procedure involved in these two cases,

including those questions set forth hereinafter. It is further

Ordered that counsel for the parties in these two cases and for the following *amici curiae* be granted leave to file briefs on or before July 29, 1968, and to request an allotment of time for oral argument on the questions set forth hereinafter:

1. Counsel for any Missouri publicly supported educational institution, including Missouri University, Missouri Southern State College, Missouri Western State College, Northeast Missouri State Teachers College, Northwest Missouri State College, Southeast Missouri State College, and Southwest Missouri State College.

2. Counsel for any privately supported educational institution.

3. The Attorney General of Missouri.

4. Counsel for the American Civil Liberties Union.

5. Counsel for any interested officially elected or officially recognized student government or faculty association.

It is further

Ordered that the filing of briefs and participation in oral argument herein shall be without prejudice to any contention that any *amicus curiae* shall make in any action to which it may be a party now or hereafter. It is further

Requested that the briefs and arguments be addressed to the following federal questions of substance and procedure in cases of student discipline:

## QUESTIONS OF SUBSTANCE

1. Is the right or privilege of attending a publicly supported educational institution protected by any of the provisions of the Constitution and statutes of the United States?

2. If the answer to question 1 above is affirmative, by what federal constitutional provisions and federal statutes is the right or privilege protected?

3. If the answer to question 1 is affirmative, to what disciplinary actions does the federal protection extend?

## QUESTIONS OF PROCEDURE

1. What are the minimal federal requirements of notice and particularity of rules of student discipline promulgated by publicly supported educational institutions?

2. What are the minimal federal procedural requirements in cases of student discipline involving (a) expulsion, (b) suspension, and (c) other disciplinary actions, including fines and suspension of normal student privileges?

3. May disciplinary authorities take disciplinary action for student misconduct which is also a crime or misdemeanor or offense under federal or state law, including municipal ordinances?

4. Does a publicly supported educational institution have authority to discipline students for offenses occurring off property controlled or owned by the institution? If so, to what extent?

5. Are there state remedies for review of student disciplinary cases which should be exhausted before resort to federal courts? If so, what are the standards applicable to review by state authorities?

6. For what causes (generally described) may a student be disciplined?

/S/ WILLIAM H. BECKER
Chief Judge

/S/ JOHN W. OLIVER
District Judge

/S/ Wm. R. COLLINSON
District Judge

/S/ ELMO B. HUNTER
District Judge