Barbara Susan PAPISH, Plaintiff,

v.

BOARD OF CURATORS OF the UNIVERSITY OF MISSOURI et al.,
Defendants.

Civ. A. No. 1466.

United States District Court,
W. D. Missouri, C. D.

May 7, 1971.

Irving Achtenberg, of Achtenberg, Sandler & Balkin, Kansas City, Mo., David N. Ellenhorn, of Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for plaintiff.

Melvin L. Wulf, Legal Director, New York City, for American Civil Liberties Union.

Jackson A. Wright, Gen. Counsel, Columbia, Mo., for defendants.

## JUDGMENT DENYING PLAINTIFF DECLARATORY AND INJUNCTIVE RELIEF; JUDGMENT FOR DEFENDANTS

WILLIAM H. BECKER, Chief Judge.

Plaintiff, formerly a graduate student in journalism in the University of Missouri at Columbia, has brought this suit for declaratory and injunctive relief under Section 2201 of Title 28, United States Code, and Section 1983, Title 42, United States Code, as a result of her dismissal from the University of Missouri on a charge of participating in the distribution of indecent publications on and near the University campus. Plaintiff seeks a declaration of this Court that Article V of Sections A and B of the By-Laws of the Board of Curators of the University of Missouri, which relates to "indecent conduct or speech," is invalid on its face and as applied in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff further requests injunctive relief permanently to restrain defendants "from interfering with plaintiff's right to remain at the University of Missouri-Columbia campus and to complete her education * * * and directing defendants to reinstate her as a graduate student"; permanently to restrain defendants "from interfering with plaintiff's constitutional right to disseminate literature protected by the First Amendment"; and to direct defendants "to take any and all steps necessary to grant plaintiff her full credit for course work successfully completed in the Spring Term of 1969." Plaintiff was enrolled as a non-resident graduate

student in journalism when the acts occurred which led to her dismissal.

On September 22, 1969, a plenary evidentiary hearing *de novo* was held in this case on the motion for preliminary injunction in accordance with the uniform practice of this Court in student discipline cases.[1] By agreement, the

---

1. Apparently there is a misunderstanding by some of the practice and procedure in student discipline cases in this district. This is found in the dissenting opinion in Esteban v. Central Missouri State College (C.A. 8) 415 F.2d 1077 at pages 1090 to 1096. The dissenting opinion, after agreeing with the four substantial bases of jurisdiction in student disciplinary cases, states at page 1090:

   "However, I reject the district court's procedural approach of reviewing the sufficiency of the evidence of the disciplinary proceedings conducted by school officials. The trial court has posited the test to be:

   'A federal district court will in *appropriate circumstances* review a student disciplinary proceeding to determine if the challenged disciplinary action was on grounds *lacking* support by any substantial evidence.'" (Emphasis added.)

   In footnote 1 at page 1090 the dissenting opinion further stated:

   "Presumably, this last statement is based upon the district court's 'General Order On Judicial Standards Of Procedure And Substance In Review of Student Discipline In Tax Supported Institutions of Higher Education.' 45 F.R.D. 133 (1968). This same standard of review is erroneously compounded in other cases from the same district, see e. g., Scoggin v. Lincoln Univ., 291 F.Supp. 161 [(W.D.Mo.1968)]."

   From these statements the dissent unintentionally but erroneously concludes that it is the practice in this district to review state student discipline cases in the manner federal agency actions are reviewed under the federal Administrative Procedure Act. The *Scoggin* case is cited as an example. *This conclusion of the dissent is directly contrary as a matter of fact to the record in every student discipline case in this district, including the two* Esteban *cases, the* Scoggin *case, this case, and all other student discipline cases.* In every such case the parties have been afforded the opportunity to develop a full evidentiary record. For example, in the *Scoggin* case this is made clear in the second paragraph which states:

   "Pursuant to procedures directed and agreed upon at pretrial conference, the parties prepared and filed a full stipulation of facts. *At the plenary evidentiary hearing* both parties advised that neither wished to adduce any additional evidence." (Emphasis added.) 291 F.Supp. 161 at page 162.

   This Court, in its General Order referred to, did not intend to state, and did not state, that "review" of student discipline is limited to review as under the Administrative Procedure Act. The word "review" was not used in that sense. This is evident from the description of the nature of the action, as an (a) action at law for damages, triable by a jury; (b) a suit in equity under Section 1983; or (c) a declaratory judgment action under Section 1983 and Section 2201, which may be legal or equitable in nature, depending on the issues therein. 45 F.R.D. 133 at page 143. Charles Alan Wright, one of the foremost authorities on federal procedure, found no limited administrative procedure type of review in this analysis of the General Order of this district. Wright, The Constitution on the Campus, 22 Vanderbilt Law Review 1027 (1969). As perceptively stated in a student law review note:

   "If the Court does not mean 'review' in the procedural sense, then Judge Lay's dissent and potential controversy disappears." 4 Georgia Law Review 221, 230.

   What the portion of the General Order referred to does mean is that, although the disciplinary procedures of the educational institution are otherwise flawless, if there is no substantial evidence of any misconduct received, a finding of misconduct violates the due process clause. Relying on the apposite case, Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654, 1. c. 659, the General Order so states. 45 F.R.D. at page 147, including note 13. The portion of the General Order is quoted and relied on in the *Scoggin* case. 291 F. Supp. at page 171. It is difficult to see how this clear language could be misunderstood.

   If an educational institution gives notice and grants a hearing but no evidence of misconduct is submitted, a finding of misconduct violates due process standards and the Court should hold the finding of misconduct impermissible under constitutional due process standards, whether other evidence is offered in Court or not. This is only one constitutional test mentioned in the General Order of this Court.

case on the merits was also submitted on this record. Full opportunity for argument and filing of briefs was afforded. On January 5, 1970, before the next semester began, the parties were advised that a decision had been reached to deny the relief sought and that the time for filing postjudgment motions or to appeal would not begin to run until the formal findings of fact and conclusions of law were filed. Because of the pending possible review of the case of Esteban v. Central Missouri State College (C.A.8) 415 F.2d 1077,[2] in the Supreme Court of the United States, and of Soglin v. Kauffman (W.D.Wis.) 295 F.Supp. 978,

disapproved in part in the *Esteban* case, *supra*, 415 F.2d at page 1099 (later affirmed in (C.A.7) 418 F.2d 163) and because of other relevant cases pending in the Supreme Court of the United States,[3] the entry of final judgment in this case was stayed. Later, certiorari was denied in the Esteban case at 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548. The *Soglin* case was not reviewed by the Supreme Court of the United States.

Plaintiff was dismissed from the University of Missouri at Columbia for her part in distributing, in and near the Me-

---

If the educational institution may offer evidence of misconduct for the first time in the action challenging the student discipline, there is no motive or need to receive evidence of misconduct at the institution's disciplinary hearing. On the other hand, if lawful notice and fair hearing are granted by the institution, ample evidence of misconduct received, reliable findings made and opportunity to be heard granted, should there be a trial *de novo* on the same factual issues in a federal civil rights action? Barker v. Hardway (C.A. 4) 399 F.2d 638, cert. denied, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217, cited in the *Esteban* dissent for the affirmative answer to this question falls short of such an explicit holding. The precise language in the *Barker* case was:

"We believe the district judge correctly concluded that the administrative appeals which the college afforded the students satisfied the requirements of due process of law. In any event the district judge granted them a plenary *de novo* hearing with counsel. It was upon the evidence received at this hearing that he based his own findings concerning the conduct that led to their suspension. The proceedings in the district court render moot the students' contention that they were denied due process at the college level."

This language falls far short of holding that: "A civil rights action under § 1983 is a separate proceeding which requires a trial de novo on the claim relating to a denial of federal rights." Cf. dissent in *Esteban* case. 415 F.2d at page 1091. The unsolved question is what would have been the ruling in the *Barker* case if a *de novo* hearing on the misconduct issue had not been granted by the district court,

and the institutional disciplinary hearing had been lawful and fair and the evidence of misconduct received at that hearing substantial. Only time will answer this question. In the meantime, in this district, all parties are offered a plenary evidentiary hearing in this Court in student discipline cases.

While discussing the General Order of this district Professor Wright comments that the General Order and the process by which it was arrived "smack more of a legislative committee or an administrative agency than they do of a court of law" to those who are old fashioned. Wright, The Constitution on the Campus, *supra*, at page 1033. In response it should be said that there are few occurrences which impair the administration of justice more than the contemporaneous and persistent enunciation and application of conflicting rulings of substance and procedure by judges of a multiple judge court with concurrent jurisdiction. To prevent such conflicts by an honest, thoughtful agreement on sound principles after hearing all known interested public and private parties is judicial administration of the highest order. This is the everyday judicial function of a multiple judge appellate court. The function does not become a legislative one when performed by a multiple judge district court. The real test of its desirability and legality is the quality of the product.

2. affirming (W.D.Mo.) 290 F.Supp. 622.

3. See, e. g., United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822; Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284; United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813.

morial Tower,[4] on February 19, 1969, Volume IV, No. 3, the February 1969 edition of the *Free Press Underground.* Plaintiff's accomplice Markham was distributing the publication on University property. Plaintiff was a 32 year old adult member of the staff of the *Free Press Underground,* a newspaper which had been published since 1965 by the Columbia Free Press Corporation, a non-profit corporation organized under the laws of Missouri, which disseminated news and opinions on University, local and world affairs. The February 1969 edition of *Free Press Underground* contained two features which the University deemed "indecent" within the terms of its by-laws: (1) the front cover duplicating a political cartoon which appeared in the February 1969 edition of *The Movement,* a liberal paper of national circulation and depicting policemen raping the Statue of Liberty and the Goddess of Justice; and (2) an article reprinted from *New Left Notes* concerning the acquittal of a young New Yorker after a trial for assault and battery by means of a dangerous weapon headlined "Mother——— Acquitted." The word "Mother———" had no relation to the news story discernible by an ordinary person. The plaintiff knowingly and intentionally participated in distributing the publication to provoke a confrontation with the authorities by pandering the publication with crude, puerile, vulgar obscenities. She admits in her affidavit in support of her motion for preliminary injunction that the cartoon is obscene, stating in part: "It is not [vulgar]; it is obscene." Earlier, on February 12, 1969, the Dean of Students had specifically directed that distribution of the same publication be discontinued because it violated University regulations against indecent literature. Plaintiff had been placed on disciplinary probation for distributing on University day an equally indecent issue of the same publication. She was also on academic probation for failure to submit portions of her thesis. This failure continued until the date of trial. As a result plaintiff is academically ineligible to continue as a student of the University.

On March 12, 1969, pursuant to Rule 5(c) of the University's rules of procedure in student disciplinary matters, plaintiff received notice of charges against her pending before the Student Conduct Committee, based on the above cited Article V of Sections A and B of the By-Laws, of conducting herself "in a manner [not] compatible with the University's functions and missions as an educational institution," in the following particulars:

"That, while you were on a status of disciplinary probation, you did distribute, or aid and assist in the distribution of the Volume IV, No. 3, February 1969 edition of the *Free Press Underground* containing forms of indecent speech, on the campus of the University of Missouri-Columbia, with knowledge that the Dean of Students had previously declared the forms of speech, therein appearing, indecent and distribution thereof improper on the University campus under existing rules and regulations."

A hearing was subsequently conducted before the Student Conduct Committee which concluded in the Committee's recommendation that plaintiff be dismissed from the University. The recommendation was adopted and affirmed by the Chancellor and the Board of Curators. In addition to being dismissed, plaintiff was denied credit for a course in ceramics which she successfully completed during the pendency of the intra-University appeals and disciplinary hearings.

---

4. The Memorial Tower is the central unit of integrated structures dedicated to the memory of those students who died in the Armed Services in World Wars I and II. Other adjacent units include the Student Union and a Non-Sectarian chapel for prayer and meditation. Through the Memorial Arch pass parents of students, guests of the University, students, including many persons under 18 years of age and high school students. Stephens, History of U. Of Mo., 1962, 620–632.

She was permitted to finish the semester for which she was enrolled.[5]

■ Student discipline cases of this type are cognizable in the federal district courts if the dismissal, suspension or other penalty imposed upon the student involves the violation of one or more of his or her federally protected rights under color of state law within the meaning of the Federal Civil Rights Act, Section 1983, Title 42, United States Code. See General Order on Student Discipline in Tax Supported Institutions of Higher Education (W.D.Mo.) 45 F.R.D. 133, 135. In this case, plaintiff does not raise any question that the procedures of notice and hearing leading to her dismissal failed to comply with minimal standards of due process. Further, it appears that plaintiff received fair notice of the charges and the hearing and an opportunity to be heard in a substantially fair disciplinary hearing, and that the findings of fact upon which the disciplinary action was based were supported by substantial evidence. See *General Order, supra.*

■ Based on the foregoing facts, it is concluded that judgment must be rendered for defendants in this cause for the separate and independent reasons that (1) plaintiff does not have a federally protected or other right to attend a state university of a state of which she is not a domiciled resident or citizen and (2) the conduct of plaintiff for which she was dismissed is not within First Amendment protections.

■ Plaintiff was not at any material time a citizen or domiciled resident of Missouri. In basing her claim on Section 1983, Title 42, United States Code, plaintiff asserts that she has been denied a civil right to attend the University of Missouri. It has long been held, however, that one state cannot be held responsible for the education of citizens of another state. In State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 350, 59 S.Ct. 232, 236, 83 L.Ed. 208, 213–214, it was said:

"Manifestly, the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities,—each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do. The separate responsibility of each state within its own sphere is of the essence of statehood maintained under our dual system."

It is well settled that the Federal Civil Rights Act was intended to protect from denial under color of state law only those rights granted to citizens of the United States under the Fourteenth Amendment or laws of the United States. Adickes v. S. H. Kress and Company, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142. The right to attend the University of Missouri, however, is extended by state law, § 172.360 RSMo, V. A.M.S., which provides as follows:

"All youths, resident of the state of Missouri, over the age of sixteen years, shall be admitted to all the privileges and advantages of the various classes of all the departments of the university of the state of Missouri without payment of tuition; provided, that each applicant for admission therein shall possess such scholastic attainments and mental and moral qualifications as shall be prescribed in rules adopted and established by

---

5. Plaintiff complains among other things of failure to give her credit for the credit she says she earned in completing this course. She has, however, failed totally to prove that, under University regulations, a dismissed student is entitled to credit for courses completed after the acts resulting in dismissal. It appears, therefore, that this complaint is unfounded.

the board of curators; and provided further, that nothing herein enacted shall be construed to prevent the board of curators from collecting reasonable tuition fees in the professional departments, and the necessary fees for maintenance of the laboratories in all departments of the university, and establishing such other reasonable fees for library, hospital, incidental expenses or late registration as they may deem necessary."

"Residence" in this and other Missouri statutes means legal residence or domicile. See cases collected in Mo.Ann. § 9(e), Restatement of Conflict of Laws (A.L.I.1937); State upon Information of Reardon v. Mueller, Mo.App., 388 S. W.2d 53.

The right, therefore, is accorded under the state law, not under the federal constitution or laws. In the absence of exceptional circumstances not present in this case, no violation of plaintiff's federal rights of due process or of equal protection can therefore be predicated on her dismissal from the University of Missouri when she was not a domiciled resident of Missouri. In Flemming v. Adams (C.A.10) 377 F.2d 975, 977, it was held that the "right to an education" is not "among those rights guaranteed by the federal constitution." See also Steier v. New York State Education Commissioner (C.A.2) 271 F.2d 13, 18, to the effect that "Education is a field of life reserved to the individual states." In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L. R.2d 1180, it was held that the requirement that education be provided equally to all persons in the state applies "where the state has undertaken to provide [the opportunity of education]." 347 U.S. at 493, 74 S.Ct. at 691, 98 L. Ed. at 880. If the rule were otherwise, intolerable burdens to educate citizens of other states could be imposed on any state by citizens of other states. Cf. Johns v. Redeker (C.A.8) 406 F.2d 878; Clarke v. Redeker (D.Iowa) 259 F.Supp. 117.

In opposition to this conclusion, plaintiff contends that Section 1983:

"  *   *   *  does not differentiate between citizens on the basis of their residence. It gives 'any citizen' the right to maintain an action against 'every person' who has subjected him to a deprivation of constitutional rights."

As pointed out above, however, because of plaintiff's citizenship and domicil no constitutional or federal statutory right to attend Missouri University was denied to plaintiff by her dismissal from Missouri University. Plaintiff rejoins that a state cannot discriminate against citizens of other states in favor of its own, citing Hague v. Committee for Industrial Organization, 307 U.S. 496, 511, 59 S.Ct. 954, 83 L.Ed. 1423; Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; and Spanos v. Skouras Theatres Corp. (C.A.2) 364 F. 2d 161. None of those cases, however, relate to education as provided by a state and are distinguishable on that ground, as well as other grounds. No discrimination is shown in the case at bar, when plaintiff might have easily availed herself of her right under the laws of the state of her domicil to attend the state universities or colleges there. This case is unlike that of Shapiro v. Thompson, *supra*, in that, in *Shapiro*, the plaintiff was actually a resident of Connecticut but was compelled by a state law to wait until she had been a resident for at least one year to be eligible for state welfare benefits. In contrast, plaintiff in this case is not a domiciled Missouri resident. There is no restriction on the right of plaintiff to travel and resettle when plaintiff has concededly maintained her domicil in a state other than Missouri. Plaintiff further contends that:

"  *   *   *  [r]ecognizing the immateriality of a student's residence, the federal district courts have upheld suits by nonresidents brought under Section 1983 against state university

officials. See, for example, Wilson v. White, G.C. 6852-2 (unreported)— (N.D.Mississippi); Zanders v. Louisiana Board of Education, [D.C.,] 281 F.Supp. 747."

But there is no indication in *Zanders* that any of the plaintiffs were nonresidents of Louisiana, under the laws of which they claimed the right to attend Grambling College. And if the referenced unpublished decision is in fact contrary to the principles and authorities cited herein and relied on by this Court, then there is no requirement that it be regarded as a controlling or persuasive authority. From the foregoing, it is apparent that plaintiff in this cause can, as a domiciled resident of another state than Missouri, claim no federal right to attend the University of Missouri.

■ Plaintiff next argues that "having admitted plaintiff as a student, the University must apply the same disciplinary standards to her as it does to resident students." Assuming without holding that this is a sound statement, there is no showing that the same disciplinary standards have not been applied and that discrimination in this regard appears. Adickes v. S. H. Kress and Company, *supra*. No denial of equal protection of the laws appears.

■ The position of plaintiff is not supported by the case of Dixon v. Alabama State Board of Education (C.A.5) 294 F.2d 150, in which it was stated that, although "The right to attend a public college or university is not in and of itself a constitutional right." (294 F.2d at 156), the right to notice and a hearing nevertheless attached once the student had been admitted. Here the notice and hearing procedures are not challenged under the due process clause. At most, by being admitted to Missouri University, plaintiff acquired a contractual right for the period of enrollment to attend subject to compliance with the scholastic and behavioral rules of the University, and to dismissal for violation thereof, provided the dismissal was

not arbitrary or capricious. Esteban v. Central Missouri State College, *supra*; Wright v. Texas Southern University (C.A.5) 392 F.2d 728. Perhaps the University thereby became obligated to refrain from dismissal of plaintiff by procedures which violated concepts of fair play or minimal due process, but no such violation is shown in the case at bar. It is therefore concluded that plaintiff, because of her nonresidence, has not shown any violation of her federal rights by being dismissed as a student from the University of Missouri under procedures complying with due process standards.

Treating plaintiff's claim for relief as an action based solely on diversity of citizenship, no breach of duty by defendants under state law is proved.

■ Further, plaintiff's contentions that First Amendment protections apply are without merit. Plaintiff contends that the material distributed by her could in no wise be deemed indecent or "obscene" under judicial decisions respecting the First Amendment right of freedom of speech (though she swears the cartoon was obscene); and therefore that to subject her to discipline for such distribution is to infringe upon her constitutional rights of free speech in the interest of no lawful mission of the University. Further, it is plaintiff's contention that the University by-law on indecent materials, if it includes such materials as distributed by plaintiff, is invalid on its face as applied, or, alternatively, that plaintiff's conduct, as a matter of law, did not constitute a violation of the by-law. Plaintiff notes in this regard that the distribution of the allegedly "indecent" material was accompanied by no violence or other proscribed conduct; that, in the hearing in this Court, Professor William Wiecek, a historian and lawyer, testified that the word "motherf——" had appeared in leading nationally-distributed magazines, some of which are sold at the University bookstore or maintained in the University library; that Professor Dan Bartlett of the University art department testi-

fied that the cartoon had social merit as a social criticism of police brutality, "similar in theme, although not in quality, to works of social criticism done by such artists as Goya, Rembrandt and Daumier"; and that so much of the *General Order, supra,* as states that school authorities may require superior ethical and moral behavior by their students "is inapplicable to activity by students involving the exercise of First Amendment rights." Without deciding whether this testimony was an expression of genuine artistic opinion (which is doubtful) the evidence of the pandering aspect must be considered. First, it should be noted that the words "indecent" and "obscene" are frequently used to express the same meaning. 50 Am. Jur.2d, Lewdness, Indecency and Obscenity § 2, pp. 451–452; 20A Words and Phrases, pp. 520–524. In this case there was evidence of offensive aggressive actions to press this offensive, indecent, vulgar publication on a captive audience, including persons under 18 years of age, in a hallowed place.

The particular interest of the state government in such instances to protect its young citizens from indecent and obscene materials was recognized in Ginsberg [*] v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195. And the impropriety of federal intervention in matters of state interest involving obscenity has recently been emphasized in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792, in instances in which irreparable injury to federal rights is not threatened. The *Ginsberg* case, *supra,* further recognized that a wider definition of obscenity existed for the young than for the adult portion of the community. In *Ginsberg,* obscenity "harmful to minors" was held to be properly proscribable. That permissible proscription is more than met by the materials which were distributed by plaintiff. Further, it is readily apparent that the "pandering" concept re-

cently enunciated in United States Supreme Court cases is applicable in the case at bar. In Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L. Ed.2d 31, it was held that, even assuming that the publications in question were not strictly obscene, the obscenity test was satisfied by the pandering manner of exploiting erotic appeal for commercial purposes. See also Rowan v. United States Post Office Department, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736; Note, Pandering, First Amendment Rights and the Right of Privacy, 22 Baylor Law Review 442, at 447, where it is noted:

> "The Court distinguished in Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), between private possession of concededly obscene material, which is constitutionally protected, and possession for the purpose of sale or exhibit, which is not protected. This situation is different from *Rowan*—one deals with protected private possession and the other with protected private rejection—but both are based upon the right of privacy * * * * "

Plaintiff argues that the University which suspended her:

> " * * * * has no power to regulate or limit the distribution of written material of any kind whatsoever by its students on the public streets and thoroughfares, unless such distribution actually materially and substantially interferes with the requirements of appropriate discipline in the operation of the school";

and that, accordingly, Article V of Section B of the by-laws, if it includes plaintiff's conduct, is invalid on its face as applied because the material distributed by plaintiff is not "obscene" *within* the meaning of the applicable test announced in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. The maintenance of a decent atmosphere in the area of Memorial Tower and the adjacent Student Union and chapel, and

---

[*] To be distinguished from *Ginzburg,* also cited in this paragraph.

the protection of persons there from the pandering of indecent publications is a lawful mission of the University. Further, it is apparently plaintiff's conclusory contention that the distributed material is not "obscene" because, in accordance with the opinion of her witnesses, the material had, in terms of *Roth,* "redeeming social value." As noted above, in considering what is obscene, this Court may take into account what is emphasized in the sale and distribution of the materials by the purveyor of the allegedly obscene materials. In Ginzburg v. United States, *supra,* 383 U.S. at 465, 86 S.Ct. at 944, 16 L.Ed.2d at 35, the United States Supreme Court held that "the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity." Further, in *Ginzburg,* it was the ruling of the Supreme Court that, even in the case where a book may have social worth in a "controlled, or even neutral, environment," the work was without the ambit of First Amendment protection when:

> "Petitioners * * * did not sell the book to * * * a limited audience, or focus their claims for it on its supposed therapeutic or educational value; rather, they deliberately emphasized the sexually provocative aspects of the work, in order to catch the salaciously disposed. They proclaimed its obscenity. * * * "

In Gable v. Jenkins (N.D.Ga.) 309 F. Supp. 998, affirmed 397 U.S. 592, 90 S. Ct. 1351, 25 L.Ed.2d 595, the rule of Stanley v. Georgia, *supra,* was held not to invalidate a Georgia statute forbidding the dissemination of "obscene materials" by any person. The same is true in this case, particularly with regard to the news story headlined, "Motherf———— Acquitted." Assuming, without holding, that the story itself may be of redeeming social importance, that aspect was not made most promi-

nent by the arrangement of the news article; rather, the obscene aspect was emphasized and featured in bold face type. The cartoon of policemen raping the Statue of Liberty and the Goddess of Justice features the crude, vulgar and obscene, obscuring any political or social commentary which might incidentally be made. This is particularly true in the University environment in which a substantial portion of the University population is under the age of 18 years and thus does not constitute the "controlled environment" in which such a cartoon might be considered as predominately a social commentary. The University community, which is mainly comprised of younger and less sophisticated persons than those mature persons who are interested in social comment, would not constitute a "controlled environment." [6] The indecent obscenity of the cartoon is recognized by plaintiff herself, who in an article in the same issue of *Free Press Underground,* stated:

> "Someone might consider the cartoon on the cover of this issue 'vulgar'. It is not; it is obscene. But it is a social comment concerning a greater obscenity. Chicago cops are obscene; napalm is the greatest obscenity of the 20th Century; and administrators who fear a different view are also obscene."

Plaintiff contends that this does not constitute an admission, or any recognition otherwise, of the obscenity of the cartoon because the article:

> "* * * goes on to say that, in her view, obscenity is found in napalm, police brutality and similar things [and that] obviously she was using the word 'obscene' in a metaphorical sense and was not admitting for legal purposes that the cartoon is legally obscene."

Plaintiff reasserts the obscenity of the cartoon in her affidavit in this case in support of her motion for preliminary injunction. In United States v. A Mo-

---

6. University records show some 1,031 students enrolled for the 1968 Fall Semester under 17 years of age.

tion Picture Film (S.D.N.Y.) 285 F. Supp. 465, 471, reversed on other grounds (C.A.2) 404 F.2d 196, an admission in the government's brief of the social value of a film was said to be a "formal judicial admission." Be that as it may, the affidavit is graphic evidence that plaintiff understood the cartoon to be "obscene" in the common sense of the word. Further, the "metaphorical" use of the term "obscene" as applied to police activities, napalm, and administrative shortsightedness would not excuse plaintiff's misconduct if accepted as true. The pandering of distinctly and flagrantly indecent, vulgar, obscene sexual cartoons and words to convey a claimed social and political message is not protected by the First or Fourteenth Amendments under the circumstances of this case. In this respect, this case is different from the recent case of Keefe v. Geanakos (C.A.1) 418 F.2d 359, in which it was held that a public high school teacher could not be dismissed for pronouncing aloud and discussing in a literature class the "vulgar term for incestuous son." In *Keefe*, it was found that the word, "although repeated, is not artificially introduced, but, is important in the development of the thesis and the conclusions of the author." Such is not the case at bar, where the indecent obscenities are appropriate neither to the place, the subject, nor to the comment thereon. Nor were they introduced in a serious classroom study of literature, without pandering. Quoting Ginsberg v. New York, *supra*, the *Keefe* case further held "that what is to be said or read to students is not to be determined by obscenity standards for adult consumption." 418 F.2d at 362.

■■■■ Finally, plaintiff alternatively contends that the condemnatory phrase—"indecent conduct or speech"— of the by-law under which she was dismissed is "excessively vague and does not provide a meaningful standard for limiting speech"; and that the by-law is overly broad. In support thereof, plaintiff cites Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205, reh. denied 361 U.S. 950, 80 S.Ct. 399, 4 L.Ed. 2d 383, and Interstate Circuit v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225. But the former case requires "scienter" in a criminal prosecution and the latter involved the question of vagueness under a municipal licensing ordinance. This is not a criminal prosecution. For the purposes of University regulations, "indecent conduct or speech" is a definite enough phrase to pass constitutional tests in its nearly being synonymous with "obscene." The University has a wide latitude and discretion in formulating rules and regulations and general standards of conduct. Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal. Rptr. 463, 472. The *Roth* test has been spoken of by the Supreme Court as requiring the application of a "standard of decency." See Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L. Ed.2d 639. The terms are otherwise defined as being synonymous, or nearly so. See Black's Law Dictionary (4th Ed.), p. 909; cf. § 1462, Title 18, United States Code; United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457. This is particularly true in the light of the established principles that substantive disciplinary standards of colleges "may require superior ethical and moral behavior" and that:

> "The legal doctrine that a prohibitory statute is void if it is overly broad or unconstitutionally vague does not, in the absence of exceptional circumstances, apply to standards of student conduct. The validity of the form of standards of student conduct, relevant to the lawful missions of higher education, ordinarily should be determined by recognized educational standards." *General Order, supra*, at 145, 146.[7]

---

7. In the recent case of Hasson v. Boothby (D.Mass.) 318 F.Supp. 1183, 1187, it was said:

> "[S]tudents may be severely punished by a school administration under its inherent authority without a prior pub-

This Court need not decide the question of overbreadth in this case, however, because the obscene publication distributed by plaintiff was not within the First Amendment protections. Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919, reh. denied 343 U.S. 988, 72 S.Ct. 1070, 96 L.Ed. 1375; Roth v. United States, supra; Anno., Right of Free Speech, 2 L.Ed.2d 1706, 1712–1713; United States v. Apple (D. Md.) 305 F.Supp. 330, affirmed (C.A.4) 417 F.2d 1070. The plaintiff was not chilled, but encouraged, in her activities by the alleged overbreadth, nor was she doubtful of whether her actions constituted misconduct. The regulation was as precise as federal statutes and court decisions on obscenity. See Section 1462, Title 18, U.S.C.; United States v. Alpers, *supra*. Further, the vagueness and overbreadth argument is without merit, first, because plaintiff received a precise oral order from an authorized person, the Dean of Students, a week earlier. Distribution of the same issue was clearly forbidden in this authorized and lawful order; second, because the underlying regulation was not unconstitutionally vague or overbroad under criminal law doctrines. Roth v. United States, *supra*. Finally, the arguments have been held inapplicable in Esteban v. Central Missouri State College (C.A. 8) 415 F.2d 1077.[8]

In support of her further contentions that she is entitled to protection of her rights under the First Amendment, plaintiff cites Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; Burnside v. Byars (C.A.5) 363 F.2d 744; Dickey v. Alabama State Board of Education (M.D. Ala.) 273 F.Supp. 613; Hammond v. South Carolina State College (D.S.C.) 272 F.Supp. 947; Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L. Ed.2d 1311; and West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. But those cases did not involve the problem of indecent publications and pandering to youths under 18 years of age, among others. On that score, plaintiff invokes an unreported case purportedly upholding the non-obscenity of this same cartoon on a poster, People v. Brown, decided by a Judge of the County Court of Suffolk County, New York. Plaintiff quotes the following from that decision:

"Although the demonstrated ability of its creator does not indicate any prospect of immortal recognition and memory among his fellow man, on the whole the poster is undeniably a savage political cartoon picturing one man's analysis of some aspect of society.

"Satire has always been one of the most physically lacerating and emotionally irritating weapons of the disenchanted, and the fact that a policeman was goaded by the thrust of the cartoon [into applying for a warrant and order of seizure authorizing a search for obscene material] indicates that the designer's message was obvious as his lack of subtlety."

lished rule specifically prohibiting the conduct in question. * * * See, e. g., Esteban v. Central Missouri State College, W.D.Mo., 1968, 290 F.Supp. 622, aff'd 8 Cir. 1969, 415 F.2d 1077; Jones v. State Bd. of Ed., M.D.Tenn., 1968, 279 F.Supp. 190, aff'd 6 Cir. 1969, 407 F.2d 834, cert. granted 1969, 396 U.S. 817, 90 S.Ct. 145, 24 L.Ed. 2d 69, but dismissed 1970, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27; Barker v. Hardway, S.D.W.Va., 1968, 283 F. Supp. 228, aff'd 4 Cir. 1968, 399 F.2d 638, cert. den. 1969, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217; Norton v. Discipline Committee of East Tennessee State University, 6 Cir. 1969, 419 F.2d 195, cert. denied 1970, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562. And the Court of Appeals for the First Circuit has indicated in dictum that it is generally inclined to favor this view. Richards v. Thurston [(C.A.1) 424 F.2d 1281)]."

8. See note 7, *supra*.

If such a final decision exists, it is neither persuasive or controlling. That case did not involve the pandering in the distribution of the material which is present in the case at bar. The same distinction applies in respect to Vought v. Van Buren Public Schools (E.D.Mich.) 306 F.Supp. 1388, and Luros v. United States (C.A.8) 389 F.2d 200.

Plaintiff's contention of overbreadth of the regulation is based upon the authority of Soglin v. Kauffman, *supra,* in which the concept of overbreadth was applied to state university regulations. That case, however, takes issue with this Court's decision in Esteban v. Central Missouri State College, *supra,* wherein judicial notice was taken "that outstanding educational authorities in the field of higher education believe, on the basis of experience, that detailed codes of prohibited student conduct are provocative and should not be employed in higher education." 290 F.Supp. at 630. See also Gable v. Jenkins, *supra.* Furthermore, even if Soglin v. Kauffman, *supra,* were followed, no relief would be granted in this case. In that case, the district court concluded that:

> "* * * injunctive relief with respect to the application of the standard of 'misconduct', without more, should be denied in this action, and that the plaintiffs and the members of their classes should be left to seek judicial review of the validity of this standard retrospectively, case by case, as it has actually been applied." 295 F.Supp. at 996.

Finally, if University authorities must describe in detail the prohibited, obscene, vulgar and intentionally repulsive acts which constitute student miscon-

duct, a provocative game of imagining and implementing endless series of undescribed obscenities, vulgarities and repulsive acts will begin to the detriment of education and to the discredit of the law. In educational history and administration detailed codes of student conduct have been found undesirable. *Brady and Snoxell, Student Personnel Work in Higher Education* (Houghton Mifflin, Boston 1961), p. 378, and Student Discipline in Higher Education 10; Williamson and Foley, *Counselling and Discipline* (McGraw-Hill 1949) 1–49, 79–83, and others cited in *General Order, supra.*

Further, it should be noted that in another field the United States Supreme Court has recently reaffirmed the principle that persons granted special privileges or rights under state law, such as the qualified right to practice law may be required to possess and exhibit superior moral standards. See Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639, and In re Stolar, 401 U.S. 3, 91 S.Ct. 713, 27 L. Ed.2d 657, relating to state bar applicants. These principles by analogy apply to students in an institution of higher learning.

All of plaintiff's contentions are therefore without merit in fact or law. It is therefore

Ordered that rendition of final judgment be no longer stayed.[9] It is further

Adjudged and ordered that plaintiff's complaint for declaratory and injunctive relief be, and it is hereby, denied and that judgment be, and it is hereby, entered for defendants and against plaintiff.[10]

9. Although some of the relevant cases pending in the Supreme Court remain undecided, plaintiff's counsel has requested that entry of final judgment be no longer stayed. See note 3, *supra.*

10. The court notes that on May 10, 1971, after the entry of the judgment herein, it received the decisions of the Supreme Court of the United States in United States v. Reidel, 402 U.S. 351, 91 S.Ct.

1410, 28 L.Ed.2d 813, and United States v. 37 Photographs, 402 U.S. 363, 91 S. Ct. 1400, 28 L.Ed.2d 822. Both cases reaffirmed the vitality of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, a case relied on by the Court for the decision in this case. Further, the Supreme Court held the rule of Stanley v. Georgia, 394 U.S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542, inapposite to cases in which public distribution is in-

volved, as in the case at bar. In United States v. 37 Photographs, *supra*, 402 U. S. at 376, 91 S.Ct. at 1408, the Supreme Court stated:

"Whatever the scope of the right to receive obscenity adumbrated in *Stanley*, that right, as we said in Reidel, does not extend to one who is seeking, as was Luros here, to distribute obscene materials to the public, nor does it extend to one seeking to import obscene materials from abroad, whether for private use or public distribution. As we held in Roth v. United States, 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498] (1957), and reiterated today in *Reidel*, *supra*, obscenity is not within the scope of first amendment protection."

Similarly, in United States v. Reidel, *supra*, 402 U.S. at 357, 91 S.Ct. at 1413, the Supreme Court refused to limit involvement of the law with obscenity "to those situations where children are involved or where it is necessary to prevent imposition on unwilling recipients of whatever age" and upheld the conviction of defendant of violating § 1461, Title 18, U.S.C., stating that:

"*Roth* has not been overruled. It remains the law in this Court and governs this case  *  *  *  Nothing in *Stanley* questioned the validity of *Roth* insofar as the distribution of obscene material was concerned."