## PAPISH v. BOARD OF CURATORS OF THE UNIVERSITY OF MISSOURI ET AL.

No. 72–794.   Decided March 19, 1973

PER CURIAM.

Petitioner, a graduate student in the University of Missouri School of Journalism, was expelled for distributing on campus a newspaper "containing forms of indecent speech"[1] in violation of a bylaw of the Board of Curators.   The newspaper, the Free Press Underground, had been sold on this state university campus for more than four years pursuant to an authorization obtained from the University Business Office.   The particular newspaper issue in question was found to be unacceptable for two reasons.   First, on the front cover the publishers had reproduced a political cartoon previously printed in another newspaper depicting policemen raping the Statue of Liberty and the Goddess of Justice.   The caption under the cartoon read: ". . . With Liberty and Justice for All."   Secondly, the issue contained an article entitled "M-----f----- Acquitted," which discussed the trial and acquittal on an assault

---

[1] This charge was contained in a letter from the University's Dean of Students, which is reprinted in the Court of Appeals' opinion. 464 F. 2d 136, 139 (CA8 1972).

charge of a New York City youth who was a member of an organization known as "Up Against the Wall, M-----f-----."

Following a hearing, the Student Conduct Committee found that petitioner had violated Par. B of Art. V of the General Standards of Student Conduct which requires students "to observe generally accepted standards of conduct" and specifically prohibits "indecent conduct or speech." [2] Her expulsion, after affirmance first by the Chancellor of the University and then by its Board of Curators, was made effective in the middle of the spring semester. Although she was then permitted to remain on campus until the end of the semester, she was not given credit for the one course in which she made a passing grade.[3]

After exhausting her administrative review alternatives within the University, petitioner brought an action

---

[2] In pertinent part, the bylaw states:

"Students enrolling in the University assume an obligation and are expected by the University to conduct themselves in a manner compatible with the University's functions and missions as an educational institution. For that purpose students are required to observe generally accepted standards of conduct. . . . [I]ndecent conduct or speech . . . are examples of conduct which would contravene this standard. . . ." 464 F. 2d, at 138.

[3] Miss Papish, a 32-year-old graduate student, was admitted to the graduate school of the University in September 1963. Five and one-half years later, when the episode under consideration occurred, she was still pursuing her graduate degree. She was on "academic probation" because of "prolonged submarginal academic progress," and since November 1, 1967, she also had been on disciplinary probation for disseminating Students for a Democratic Society literature found at a university hearing to have contained "pornographic, indecent and obscene words." This dissemination had occurred at a time when the University was host to high school seniors and their parents. 464 F. 2d, at 139 nn. 3 and 4. But disenchantment with Miss Papish's performance, understandable as it may have been, is no justification for denial of constitutional rights.

for declaratory and injunctive relief pursuant to 42 U. S. C. § 1983 in the United States District Court for the Western District of Missouri. She claimed that her expulsion was improperly premised on activities protected by the First Amendment. The District Court denied relief, 331 F. Supp. 1321, and the Court of Appeals affirmed, one judge dissenting. 464 F. 2d 136. Rehearing *en banc* was denied by an equally divided vote of all the judges in the Eighth Circuit.

The District Court's opinion rests, in part,[4] on the conclusion that the banned issue of the newspaper was obscene. The Court of Appeals found it unnecessary to decide that question. Instead, assuming that the newspaper was not obscene and that its distribution in the community at large would be protected by the First Amendment, the court held that on a university campus "freedom of expression" could properly be "subordinated to other interests such as, for example, the conventions of decency in the use and display of language and pictures." *Id.,* at 145. The court concluded that "[t]he Constitution does not compel the University . . . [to allow] such publications as the one in litigation to be publicly sold or distributed on its open campus." *Ibid.*

This case was decided several days before we handed down *Healy* v. *James,* 408 U. S. 169 (1972), in which, while recognizing a state university's undoubted preroga-

---

[4] Prefatorily, the District Court held that petitioner, who was a nonresident of Missouri, was powerless to complain of her dismissal because she enjoyed no "federally protected or other right to attend a state university of a state of which she is not a domiciled resident." 331 F. Supp. 1321, 1326. The Court of Appeals, because it affirmed on a different ground, deemed it "unnecessary to comment" upon this rationale. 464 F. 2d, at 141 n. 9. The District Court's reasoning is directly inconsistent with a long line of controlling decisions of this Court. See *Perry* v. *Sindermann,* 408 U. S. 593, 596–598 (1972), and the cases cited therein.

tive to enforce reasonable rules governing student conduct, we reaffirmed that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Id.,* at 180. See *Tinker* v. *Des Moines Independent School District,* 393 U. S. 503 (1969). We think *Healy* makes it clear that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of "conventions of decency." Other recent precedents of this Court make it equally clear that neither the political cartoon nor the headline story involved in this case can be labeled as constitutionally obscene or otherwise unprotected. *E. g., Kois* v. *Wisconsin,* 408 U. S. 229 (1972); *Gooding* v. *Wilson,* 405 U. S. 518 (1972); *Cohen* v. *California,* 403 U. S. 15 (1971).[5] There is language in the opinions below which suggests that the University's action here could be viewed as an exercise of its legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech and its dissemination. While we have repeatedly approved such regulatory authority, *e. g., Healy* v. *James,* 408 U. S., at 192–193, the facts set forth in the opinions below show clearly that petitioner was expelled because of the disapproved *content* of the newspaper rather than the time, place, or manner of its distribution.[6]

---

[5] Under the authority of *Gooding* and *Cohen,* we have reversed or vacated and remanded a number of cases involving the same expletive used in this newspaper headline. *Cason* v. *City of Columbus,* 409 U. S. 1053 (1972); *Rosenfeld* v. *New Jersey,* 408 U. S. 901 (1972); *Lewis* v. *City of New Orleans,* 408 U. S. 913 (1972); *Brown* v. *Oklahoma,* 408 U. S. 914 (1972). Cf. *Keefe* v. *Geanakos,* 418 F. 2d 359, 361 and n. 7 (CA1 1969).

[6] It is true, as MR. JUSTICE REHNQUIST's dissent indicates, that the District Court emphasized that the newspaper was distributed near the University's memorial tower and concluded that petitioner was engaged in "pandering." The opinion makes clear, however, that the reference to "pandering" was addressed to the content of the news-

Since the First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech, and because the state University's·action here cannot be justified as a non-discriminatory application of reasonable rules governing conduct, the judgments of the courts below must be reversed. Accordingly the petition for a writ of certiorari is granted, the case is remanded to the District Court, and that court is instructed to order the University to restore to petitioner any course credits she earned for the semester in question and, unless she is barred from re-instatement for valid academic reasons, to reinstate her as a student in the graduate program.

*Reversed and remanded.*

Mr. Chief Justice Burger, dissenting.

I join the dissent of Justice Rehnquist which follows and add a few observations.

The present case is clearly distinguishable from the Court's prior holdings in *Cohen, Gooding,* and *Rosenfeld,*

---

paper and to the organization on the front page of the cartoon and the headline, rather than to the manner in which the newspaper was dis-seminated. 331 F. Supp., at 1325, 1328, 1329, 1330, 1332. As the Court of Appeals opinion states, "[t]he facts are not in dispute." 464 F. 2d, at 138. The charge against petitioner was quite unrelated to either the place or manner of distribution. The Dean's charge stated that the "forms of speech" contained in the newspaper were "improper on the University campus." *Id.,* at 139. Moreover, the majority below quoted without disapproval petitioner's verified affi-davit stating that "no disruption of the University's functions occurred in connection with the distribution." *Id.,* at 139–140. Likewise, both the dissenting opinion in the Court of Appeals and the District Court opinion refer to this same uncontroverted fact. *Id.,* at 145; 331 F. Supp., at 1328. Thus, in the absence of any disruption of campus order or interference with the rights of others, the sole issue was whether a state university could proscribe this form of expression.

as erroneous as those holdings are.* *Cohen, Gooding,* and *Rosenfeld* dealt with prosecutions under criminal statutes which allowed the imposition of severe penalties. Unlike such traditional First Amendment cases, we deal here with rules which govern conduct on the campus of a state university.

In theory, at least, a university is not merely an arena for the discussion of ideas by students and faculty; it is also an institution where individuals learn to express themselves in acceptable, civil terms. We provide that environment to the end that students may learn the self-restraint necessary to the functioning of a civilized society and understand the need for those external restraints to which we must all submit if group existence is to be tolerable.

I find it a curious—even bizarre—extension of *Cohen, Gooding,* and *Rosenfeld* to say that a state university is impotent to deal with conduct such as that of the petitioner. Students are, of course, free to criticize the university, its faculty, or the Government in vigorous, or even harsh, terms. But it is not unreasonable or violative of the Constitution to subject to disciplinary action those individuals who distribute publications which are at the same time obscene and infantile. To preclude a state university or college from regulating the distribution of such obscene materials does not protect the values inherent in the First Amendment; rather, it demeans those values. The anomaly of the Court's holding today is

---

*Cohen* v. *California,* 403 U. S. 15, 27 (1971) (BLACKMUN, J., with whom BURGER, C. J., and Black, J., joined, dissenting); *Gooding* v. *Wilson,* 405 U. S. 518, 528 (1972) (BURGER, C. J., dissenting), 534 (BLACKMUN, J., dissenting); *Rosenfeld* v. *New Jersey,* 408 U. S. 901, 902 (1972) (BURGER, C. J., dissenting), 903 (POWELL, J., dissenting), 909 (REHNQUIST, J., dissenting).

suggested by its use of the now familiar "code" abbreviation for the petitioner's foul language.

The judgment of the Court of Appeals was eminently correct. It should be affirmed.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

We held in *Healy* v. *James,* 408 U. S. 169, 180 (1972), that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." But that general proposition does not decide the concrete case now before us. *Healy* held that the public university there involved had not afforded adequate notice and hearing of the action it proposed to take with respect to the students involved. Here the Court of Appeals found, and that finding is not questioned in this Court's opinion, that "the issue arises in the context of a student dismissal, after service of written charges and after a full and fair hearing, for violation of a University rule of conduct." 464 F. 2d 136, 138.

Both because I do not believe proper exercise of our jurisdiction warrants summary reversal in a case dependent in part on assessment of the record and not squarely governed by one of our decisions, and because I have serious reservations about the result reached by the Court, I dissent from the summary disposition of this case.

I

Petitioner Papish has for many years been a graduate student at the University of Missouri. Judge Stephenson, writing for the Court of Appeals in this case, summarized her record in these words:

> "Miss Papish's academic record reveals that she was in no rush to complete the requirements for her grad-

uate degree in Journalism. She possesses a 1958 academic degree from the University of Connecticut; she was admitted to graduate school at the University of Missouri in September in 1963; and although she attended school through the fall, winter, and summer semesters, she was, after 6 years of work, making little, if any, significant progress toward the achievement of her stated academic objective. At the time of her dismissal, Miss Papish was enrolled in a one-hour course entitled 'Research Journalism' and in a three-hour course entitled 'Ceramics 4.' In the semester immediately preceding her dismissal, she was enrolled only in 'Ceramics 3.' " 464 F. 2d, at 138 n. 2.

Whatever may have been her lack of ability or motivation in the academic area, petitioner had been active on other fronts. In the words of the Court of Appeals:

"3. On November 1, 1967, the Faculty Committee on Student Conduct, after notice of charges and a hearing, placed Miss Papish on disciplinary probation for the remainder of her student status at the University. The basis for her probation was her violation of the general standard of student conduct . . . . This action arose out of events which took place on October 14, 1967 at a time when the University was hosting high school seniors and their parents for the purpose of acquainting them with its educational programs and other aspects of campus life. She specifically was charged, *inter alia*, with openly distributing, on University grounds, without the permission of appropriate University personnel, two non-University publications of the Students for Democratic Society (SDS). It was alleged in the notice of charges, and apparently established at

the ensuing hearing, that one of these publications, the *New Left Notes*, contained 'pornographic, indecent and obscene words, "f---," "bull s---," and "sh--s."' The notice of charges also recites that the other publication, *The CIA at College: Into Twilight and Back*, contained 'a pornographic and indecent picture depicting two rats apparently fornicating on its cover . . . .'

"4. Some two weeks prior to the incident causing her dismissal, Miss Papish was placed on academic probation because of prolonged submarginal academic progress. It was a condition of this probation that she pursue satisfactory work on her thesis, and that such work be evidenced by the completion and presentation of several completed chapters to her thesis advisor by the end of the semester. By letter dated January 31, 1969, Miss Papish was notified that her failure to comply with this special condition within the time specified would result in the termination of her candidacy for a graduate degree." *Id.,* at 138–139, nn. 3, 4.

It was in the light of this background that respondents finally expelled petitioner for the incident described in the Court's opinion. The Court fails to note, however, two findings made by the District Court with respect to the circumstances under which petitioner hawked her newspaper near the memorial tower of the University:

"The Memorial Tower is the central unit of integrated structures dedicated to the memory of those students who died in the Armed Services in World Wars I and II. Other adjacent units include the Student Union and a Non-Sectarian chapel for prayer and meditation. Through the Memorial Arch pass parents of students, guests of the University, stu-

dents, including many persons under 18 years of age and high school students." 331 F. Supp. 1321, 1325 n. 4.

"The plaintiff knowingly and intentionally participated in distributing the publication to provoke a confrontation with the authorities by pandering the publication with crude, puerile, vulgar obscenities." *Id.*, at 1325.

## II

I continue to adhere to the dissenting views expressed in *Rosenfeld* v. *New Jersey*, 408 U. S. 901 (1972), that the public use of the word "M-----f-----" is "lewd and obscene" as those terms were used by the Court in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942). There the Court said:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*, at 571–572.

But even were I convinced of the correctness of the Court's disposition of *Rosenfeld*, I would not think it should control the outcome of this case. It simply does not follow under any of our decisions or from the language of the First Amendment itself that because peti-

tioner could not be criminally prosecuted by the Missouri state courts for the conduct in question, she may not therefore be expelled from the University of Missouri for the same conduct. A state university is an establishment for the purpose of educating the State's young people, supported by the tax revenues of the State's citizens. The notion that the officials lawfully charged with the governance of the university have so little control over the environment for which they are responsible that they may not prevent the public distribution of a newspaper on campus which contained the language described in the Court's opinion is quite unacceptable to me, and I would suspect would have been equally unacceptable to the Framers of the First Amendment. This is indeed a case where the observation of a unanimous Court in *Chaplinsky* that "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality" applies with compelling force.

### III

The Court cautions that "disenchantment with Miss Papish's performance, understandable as it may have been, is no justification for denial of constitutional rights." Quite so. But a wooden insistence on equating, for constitutional purposes, the authority of the State to criminally punish with its authority to exercise even a modicum of control over the university which it operates, serves neither the Constitution nor public education well. There is reason to think that the "disenchantment" of which the Court speaks may, after this decision, become widespread among taxpayers and legislators. The system of tax-supported public universities which has grown up

in this country is one of its truly great accomplishments; if they are to continue to grow and thrive to serve an expanding population, they must have something more than the grudging support of taxpayers and legislators. But one can scarcely blame the latter if, told by the Court that their only function is to supply tax money for the operation of the university, the "disenchantment" may reach such a point that they doubt the game is worth the candle.